**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

FILED

JAN 18 2012

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

SHIRLEYANN BETHEA NIXON,

    Plaintiff,

v.

                                  Case No.: 2:11cv122

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

    Defendant.

## UNITED STATES MAGISTRATE JUDGE'S REPORT AND RECOMMENDATIONS

The plaintiff, Shirleyann Bethea Nixon ("Ms. Nixon"), brings this action under 42 U.S.C. § 405(g) and § 1383(c)(3) seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for disability insurance benefits ("DIB") and supplemental security income ("SSI") under the Social Security Act (the "Act").

This action was referred to the undersigned United States Magistrate Judge, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B), by order of reference filed July 27, 2011. For the reasons expressed herein, the Court RECOMMENDS that the Commissioner's decision be AFFIRMED.

-1-

## I.   FACTUAL AND PROCEDURAL BACKGROUND

Ms. Nixon protectively filed applications for DIB and SSI on February 14,[1] 2007 alleging a disability onset date of October 1, 2006.[2]  R.[3] 12, 123-125.  Her application alleged disability on the basis of bipolar disorder. R. 127.  At that time, she was 39 years old. R. 18, 123. At the time of Ms. Nixon's date last insured, which was determined to be December 31, 2007, she was 40 years old.[4] R. 68.  Ms. Nixon graduated from high school in 1987.  R. 131.  From 1995 to 1999, she worked as a janitor. R. 128.  From 2000 to 2006, she ran an in-home daycare center. Id.  Ms. Nixon has not worked since 2006. R. 127.  She is separated from her husband, and lived with her mother and son at

---

[1]  The ALJ's decision states that Ms. Nixon filed her claims on January 17, 2007, but it appears from the record that she in fact filed her claims on February 14, 2007. R. 97-107.

[2]  The SSA administers DIB and SSI through separate programs pursuant to 42 U.S.C. § 401 et seq. and § 1381 et seq., but the statutory scheme and regulations for determining eligibility for these benefits based on disability are, for all relevant purposes, identical.  See Craig v. Chater, 76 F.3d 585, 589 n.1 (4th Cir. 1996); 20 C.F.R. pts. 404, 416.

[3]  "R." refers to the certified administrative record of proceedings relating to this case (ECF No. 7), filed under seal pursuant to Local Civil Rule 7(C)(1).

[4]  A claimant for DIB cannot qualify for benefits after her insured status has expired. See 42 U.S.C. § 423(a)(1) & (c). Accordingly, to receive DIB, Ms. Nixon needed to demonstrate that she was disabled prior to December 31, 2007. Id.; see Farley v. Califano, 599 F.2d 606, 607 (4th Cir. 1979).  The same rule does not govern qualification for SSI, see Wilkins v. Sec'y, Dep't Health & Human Servs., 953 F.2d 93, 94 (4th Cir. 1991).  Accordingly, the ALJ examined the medical evidence concerning Ms. Nixon's impairments through the date of his decision. R. 19.

the time of her administrative hearing. R. 45. Ms. Nixon was diagnosed with bipolar disorder as early as 1992 and has a history of inpatient hospitalization due to mental health issues dating back to 1993. R. 186, 188, 236.

Ms. Nixon's claims were initially denied on January 10, 2008, and again upon reconsideration on August 15, 2008. R. 66-69. Ms. Nixon requested a hearing before an Administrative Law Judge ("ALJ") of the Social Security Administration ("SSA"). R. 87. Pursuant to this request, a hearing was held on November 2, 2009, at which Ms. Nixon testified and was represented by counsel. R. 42-65. A vocational expert, Linda Fernandez Augins, also testified at the hearing. R. 61-64.

On November 23, 2009, the ALJ issued a decision stating that Ms. Nixon was not disabled within the meaning of the Act through the date of his decision and was therefore not entitled to benefits. R. 19. On December 10, 2009, Ms. Nixon timely requested that the Appeals Council of the SSA's Office of Hearings and Administration review the ALJ's decision. R. 40. On December 29, 2010, the Appeals Council denied Ms. Nixon's request for review, thereby rendering the ALJ's November 23, 2009 decision the final decision of the Commissioner under 42 U.S.C. § 405(g) and § 1383(c)(3). See 20 C.F.R. §§ 404.1481, 416.981.

-3-

Ms. Nixon timely instituted this action seeking judicial review of the Commissioner's decision denying her benefits claims. She filed a complaint with the Court on February 24, 2011, (ECF No. 1), which the Commissioner answered on May 6, 2011, (ECF No. 5). Ms. Nixon filed a motion for summary judgment and supporting memorandum on June 10, 2011, (ECF Nos. 9-10), and the Commissioner filed a motion for summary judgment and supporting memorandum as well as a memorandum in opposition to Ms. Nixon's motion for summary judgment on July 11, 2011, (ECF Nos. 11-13). Ms. Nixon filed a reply to the Commissioner's motion for summary judgment on July 25, 2011. ECF No. 14. Because neither party has indicated special circumstances requiring oral argument in this matter, the case is deemed submitted for decision based on the motion papers and memoranda. See Local Civil Rule 7(J).

## II. **ISSUES ON APPEAL**

Ms. Nixon asserts that the ALJ's November 29, 2009 decision was not supported by substantial evidence because the ALJ: (1) failed to conclude that Ms. Nixon's mental impairment satisfies the criteria for a disabling mental disorder under Listing 12.04 of the Secretary's Listing of Impairments located in Appendix 1 of 20 C.F.R. Part 404, Subpart P ("Appendix 1"); (2) improperly found that Ms. Nixon was able to perform work on a regular and

sustained basis; and (3) improperly concluded that Ms. Nixon was capable of performing past relevant work as a janitor.

### III. LAW GOVERNING DISABILITY DETERMINATIONS

The Social Security Regulations define "disability" for the purpose of obtaining disability benefits under Title II of the Act as the

> inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment[5] which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

20 C.F.R. §§ 404.1505(a), 416.905(a); see also 42 U.S.C. § 423(d)(1)(a). To meet this definition, the claimant must have a severe impairment which makes it impossible to do previous work or any other substantial gainful activity[6] that exists in the national economy. 20 C.F.R. §§ 404.1505(a), 416.905(a); see also 42 U.S.C. § 423(d)(2)(A).

### A. Five-Step Sequential Analysis

The Commissioner follows a five-step sequential analysis to ascertain whether the claimant is disabled, which is set forth

---

[5] A "medically determinable physical or mental impairment" is an impairment resulting from "anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).
[6] "Substantial gainful activity" is work that (1) involves performing significant or productive physical or mental duties, and (2) is done (or intended) for pay or profit. 20 C.F.R. §§ 404.1510, 416.910.

at 20 C.F.R. §§ 404.1520 and 416.920. See Hall v. Harris, 658 F.2d 260, 264-65 (4th Cir. 1981). Under this process, the ALJ must determine in sequence:

    (1)    Whether the claimant is engaged in substantial gainful activity (i.e., whether the claimant is working). If so, the claimant is not disabled and the inquiry is halted.

    (2)    Whether the claimant has a severe impairment. If not, then the claimant is not disabled and the inquiry is halted.

    (3)    Whether the impairment meets or equals the medical criteria of 20 C.F.R., Part 404, Subpart P, Appendix 1, which sets forth a list of impairments that warrant a finding of disability without considering vocational criteria. If so, the claimant is disabled and the inquiry is halted.

    (4)    Whether the impairment prevents the claimant from performing past relevant work. If not, the claimant is not disabled and the inquiry is halted.

    (5)    Whether the claimant is able to perform any other work considering both her residual functional capacity and her vocational abilities. If so, the claimant is not disabled.

## IV.  **THE ALJ'S FINDINGS OF FACT AND CONCLUSIONS OF LAW**

In this case, the ALJ reached the fourth step of the sequence, at which point he determined that Ms. Nixon was capable of performing past relevant work as a janitor and was therefore not disabled.  R. 18.  The ALJ nevertheless proceeded to step five and again concluded that, based on Ms. Nixon's age, education, past relevant work experience, and RFC, she was able to perform jobs that exist in significant numbers in the national economy. R. 18-19.

### A. **Steps One and Two**

At step one of the sequential analysis, the ALJ determined that Ms. Nixon had not engaged in substantial gainful activity since October 1, 2006, the alleged disability onset date. R. 14. At step two of the analysis, the ALJ determined that Ms. Nixon's bipolar disorder constituted a severe impairment that "significantly affected her ability to perform basic work functions such as sustaining concentration to carry out detailed instructions and constant interaction with the general public and coworkers." Id.

### B. **Step Three: Listing of Impairments**

At step three, the ALJ determined that Ms. Nixon's bipolar disorder did not meet and was not medically equal to the criteria for a disabling affective disorder under Listing 12.04

in Appendix 1.[7]  R.  14.  In arriving at this conclusion, the ALJ first determined that Ms. Nixon's bipolar disorder did not meet the criteria of paragraph B in Listing 12.04.[8]  R.  15. Specifically, the ALJ concluded that Ms. Nixon experienced only mild restrictions in her activities of daily living because she was capable of "managing within a basic routine" and the "evidence fail[ed] to support that [she was] unable to meet personal needs, prepare simple meals or perform routine chores."[9] Id.  The ALJ concluded that Ms. Nixon experienced moderate difficulties with regard to social functioning and

---

[7] An affective disorder is "characterized by disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation." 20 C.F.R. Pt. 404 Subpt. P, App. 1, Listing 12.04(A).

[8] With respect to mental disorders, the Listing of Impairments requires the Commissioner to examine the functional limitations caused by a claimant's impairment. See 20 C.F.R. Pt. 404 Subpt. P, App. 1, Listing 12.00(A). Functional limitations are set out in paragraphs B and C for each mental disorder.  Id.  Medical criteria for establishing impairments are found in Paragraph A. For an affective disorder to qualify as disabling, there must be a medically documented persistence of depressive syndrome, manic syndrome, or bipolar syndrome "resulting in at least two of the following [paragraph B criteria]: 1. Marked restriction of activities of daily living; or 2. Marked difficulties in maintaining social function; or 3. Marked difficulties in maintaining concentration, persistence, or pace; or 4. Repeated episodes of decompensation, each of extended duration." Id., Listing 12.04(A)-(B). "Marked" means "more than moderate but less than extreme." Id., Listing 12.00(C).

[9] "Activities of daily living include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for [claimant's] grooming and hygiene, using telephones and directories, and using a post office." 20 C.F.R. Pt. 404 Subpt. P, App. 1, Listing 12.00(C)(1).

concentration, persistence and pace.[10] Id. He noted that, with
medication compliance, Ms. Nixon was able to interact and relate
appropriately with others and that she "can understand and
execute simple instructions, make simple decisions and set
simple goals." Id. Finally, the ALJ concluded that Ms. Nixon
had not experienced any episodes of decompensation of extended
duration.[11] The ALJ also determined that Ms. Nixon's bipolar
disorder did not meet the criteria of paragraph C in Listing
12.04.[12]

---

[10] "Social functioning refers to [a claimant's] capacity to
interact independently, appropriately, effectively, and on a
sustained basis with other individuals. Social functioning
includes the ability to get along with others, such as family
members, friends, neighbors, grocery clerks, landlords, or bus
drivers." 20 C.F.R. Pt. 404 Subpt. P, App. 1, Listing
12.00(C)(2). "Concentration, persistence, or pace refers to the
ability to sustain focused attention and concentration
sufficiently long to permit the timely and appropriate
completion of tasks commonly found in work settings." Id.,
Listing 12.00(C)(3)-(4).
[11] "Episodes of decompensation are excerbations or temporary
increases in symptoms or signs accompanied by a loss of adaptive
functioning, as manifested by difficulties in performing
activities of daily living, maintaining social relationships, or
maintaining concentration, persistence, or pace." 20 C.F.R. Pt.
404 Subpt. P, App. 1, Listing 12.00(C)(4). Episodes of
decompensation of extended duration generally means "three
episodes within 1 year, or an average of once every 4 months,
each lasting for at least 2 weeks." Id.
[12] If a claimant's affective disorder does not meet the criteria
of paragraph B, she may nevertheless qualify as disabled under
paragraph C. 20 C.F.R. Pt. 404 Subpt. P, App. 1, Listing 12.04.
To qualify under paragraph C, the claimant must have a:
    [m]edically documented history of a chronic organic
    mental disorder of at least 2 years' duration that has
    caused more than a minimal limitation of ability to do
    basic work activities, with symptoms or signs

## C. **Residual Functional Capacity Determination**

Between steps three and four, the ALJ determined Ms. Nixon's residual functional capacity ("RFC"), based on his evaluation of the entire record, including plaintiff's testimony, the findings of treating and examining physicians, and the state agency's disability determination, rendered by two non-examining physicians. R. 15-18. The ALJ concluded that Ms. Nixon possessed the RFC "to perform the full range of work at all exertional levels. Non-exertionally, the claimant can perform simple, repetitive work requiring only occasional decision making and changes in the workplace. The claimant can interact with the public and co-workers on a limited basis." R. 15.

### 1.   **Ms. Nixon's Testimony**

The ALJ determined that Ms. Nixon suffered from a medically determinable impairment that could reasonably be expected to

---

> currently attenuated by medication or psychosocial support, and one of the following: 1. Repeated episodes of decompensation, each of extended duration; or
> 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
> 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.
> Id., Listing 12.04(C).

cause her alleged symptoms, but he concluded that her testimony about the intensity, persistence, and limiting effects of her symptoms was only partially credible because it was inconsistent with other evidence in the record. R. 16.

When asked about her typical day, Ms. Nixon responded that she has a "lot of mood swings" and "sometimes I might feel happy-go-lucky and ready, and sometimes I feel like . . . I just lay in bed and don't care and won't get up . . . ." R. 47. She stated that she was able to sleep for three or more days at a time and that sometimes her son or her sister have to wake her up and convince her to groom herself or leave the house to go shopping. R. 16, 47, 56.   If she has nowhere to go she will sleep because her medicine makes her a "zombie." R. 57. She stated that she has to take her medicine because is she does not "I'm going to be manic. . . . I might be talking to myself . . . . I've done it before, and I ended up in the hospital." Id.

She testified that she is able to shop for a single item on her own, but that she requires assistance if she needs to purchase more than one item.   R. 48.   She considered herself dependable at taking care of household chores. R. 58.   She indicated that she can load dishes into the dishwasher, take turns doing laundry, cook food if she is watching a cooking show on television, and occasionally make her bed. R. 48-49.   Her

-11-

benefits application indicates that she can prepare frozen meals up to twice a day. R. 135. She testified that she does not participate in group meetings or outside activities. R. 60. In her benefits application, she stated that she does not participate in social events because of her illness. R. 137.

Ms. Nixon testified that she thought her inability to interact with other people would not allow her to keep a job. R. 59. She stated that she had been fired from jobs because "I have my opinion." R. 54. When asked if she had a problem working with others she responded that "[s]ome of them is really stupid because I have really -- I've been with some people, and they get on my nerves, even though I've got to go in there with them and talk for them . . . . It's a mess." R. 55.

The ALJ noted that it appeared from Ms. Nixon's testimony that she had "sufficient insight to take her medication regularly and keep her condition under control." R. 16.

## 2. Medical Evidence and Opinions

The ALJ determined that the medical evidence in the record was fully consistent with his RFC assessment. R. 16.

### i. Evidence From Dr. Mansheim

The ALJ considered evaluation and treatment notes from Dr. Mansheim of Riverpoint Psychiatric Associates. The record indicates that Dr. Mansheim was Ms. Nixon's treating psychiatrist from March 2001 through July 2009. R. 188-89,

-12-

200-09, 246, 279-296. During a clinical evaluation on January 24, 2005, Dr. Mansheim noted that Ms. Nixon stated that she was not taking any medication. R. 188. He noted that Ms. Nixon had been diagnosed with bipolar disorder and had a history of inpatient psychiatric hospitalization going back to 1993, with the most recent hospitalization in January 2002.[13] Id. The last time he had seen her was October 2002. Id.

Upon evaluation, Dr. Mansheim observed that Ms. Nixon was "oriented to time, place, and person" and that her "[r]emote and recent memories were grossly intact." R. 188. He acknowledged that she had had "manic episodes with psychotic features in the past" but that there was "no immediate evidence of hallucinations, delusions, or other evidence of a thought disorder." Id. Dr. Mansheim observed that Ms. Nixon "rambled a bit" but that generally her "speech and language were goal directed." Id. Her "mood was a bit euphoric," but her "affect and mood were congruent." Id. Ms. Nixon's intelligence "appeared approximately average with an approximately average fund of general information." He determined that her "insight and judgment were adequate for outpatient treatment" but that it was "imperative that she get back on lithium." Id.

---

[13] There is no other evidence of this hospitalization in the record.

Dr. Mansheim diagnosed Ms. Nixon with "bipolar disorder, most recent episode manic, in partial remission." Id. He gave her a Global Assessment of Functioning ("GAF") score of 60 at the time, estimating that her highest GAF in the past year was also 60.[14]  R. 189. He gave Ms. Nixon a prescription for lithium carbonate. Id.

The remaining evidence from Dr. Mansheim consists of treatment and progress notes from March 10, 2005 through July 31, 2009, with a significant gap between February 2006 and March 2007.  These notes show that Ms. Nixon was generally tolerating her medications well and not complaining of any adverse side-effects. R. 279-285.  At a visit on March 10, 2005, Dr. Mansheim prescribed Klonopin 1 mg as needed to help with Ms. Nixon's complaints of anxiety and told Ms. Nixon to continue taking 600 mg of lithium carbonate per day.  R. 209.  Dr. Mansheim continued to prescribe Klonopin and lithium carbonate without changes in dosage through February 8, 2006. R. 204-209.

On March 3, 2007, Dr. Mansheim stated that Ms. Nixon "continues to receive lithobid 300 mg in the morning and 600 mg

---

[14] GAF scores are "used to report the clinician's judgment of the subject's overall level of functioning. A score of between 51 and 60 is indicative of moderate symptoms or moderate difficulty in social, occupational, or school functioning." Pryor v. Astrue, 650 F. Supp. 2d 493, 496 n.2 (W.D. Va. 2009) (citing American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000) [hereinafter "DSM-IV-TR"]).

at bedtime.  She is also receiving Abilify 30 mg per day." R. 203.  In October 2007, Ms. Nixon asked to stop taking Abilify. R. 202.  She began reporting trouble sleeping in December 2007, at which point Dr. Mansheim prescribed 10 mg of Ambien at bedtime as needed.  R. 200.  Throughout this period, Ms. Nixon was taking 900 mg of Lithobid a day.

From December 2007 through July 31, 2009, the last treatment note from Dr. Mansheim in the record, Dr. Mansheim continued to prescribe 900 mg of Lithobid per day. R. 279-292. On August 27 2008, a week after Ms. Nixon had been discharged from the Virginia Beach Psychiatric Center, Dr. Mansheim noted that she had not been compliant in taking her Lithobid and supportively confronted her.  R. 287.  At this visit, Ms. Nixon's also complained of not being able to sleep well and stated that she would like to take Lorazepam rather than Ambien. R. 287, 200.  In October 2008, Dr. Mansheim added Haldol and Cogentin to Ms. Nixon's drug regimen.  R. 286. He continued to prescribe Lorazepam, Haldol, and Cogentin for Ms. Nixon through July 31, 2009.

    ii.    Evidence from Virginia Beach Psychiatric Center

The record contains evaluation and treatment notes from four hospitalizations between November 1998 and August 2008, during which Ms. Nixon was treated for symptoms related to her bipolar disorder.  R. 190-99, 279-96.  None of her stays lasted

-15-

longer than ten days.  Id.  The record also indicates that she was hospitalized in 2002 and that she had one hospitalization prior to November 1998.  R. 188, 248.

The Admission Evaluation from Ms. Nixon's 1998 hospitalization indicates that she was extremely agitated, angry, showing elated mood, pressured speech, and impaired insight and judgment when she was voluntarily admitted on November 17th.  R. 276-77.  She was delusional with ideas of persecution and grandeur, believing that she had special abilities to improve working conditions for her coworkers but also feeling that her employer was persecuting her. R. 277.  She had been suspended from work for the second time in a week for conducting personal business on the job. R. 276.  She stated that she wanted to punch her boss in the head.  R. 276.  She was also having visions of her deceased sister telling her to "calm down."  R. 277.  She was diagnosed with "Bipolar Disorder, mixed, with psychotic features."  Id.  She was given a GAF score of 40.[15] The Discharge Summary from November 23, 1998 indicates that Ms. Nixon had attained maximum benefit from an inpatient stay, but that her prognosis was guarded.  R. 249.  She was directed to

---

[15] A GAF score of 31-40 is indicative of "some impairment in reality testing or communication . . . OR major impairment in several areas, such as work or school, family relations, judgment, thinking or mood . . . ." DSM-IV-TR 34.

-16-

take 900 mg of Lithium per day and 10 mg of Zyprexa.  Id.  She had an improved GAF score of 45.[16]  R. 250.

Ms. Nixon again presented to the hospital voluntarily for observation, stabilization, and treatment on July 1, 2001 because her psychosis was "out of control" and she was delusional.  R. 273, 275.  The Admission Note states that she had stopped taking her medication a month prior because she became pregnant.  R. 273.  At the time of observation, her mood and affect were euphoric and her speech and psychomotor activity were increased.  Id.  She appeared disheveled, and reported that she was unable to care for herself.  Id.  She was not having delusions, hallucinations, or suicidal or homicidal ideations. R. 274.  Her memory and fund of knowledge where intact.  Id. She was diagnosed as "Bipolar manic," and the examining physician gave her a GAF score of 20-30, but noted that her highest score in the past year was 70-80.[17]  Id.  During her

---

[16] A GAF score of 41-50 is indicative of "[s]erious symptoms . . . OR any serious impairment in social, occupational, or school functioning." DSM-IV-TR 34.

[17] Scores between 21 and 30 denote behavior that is seriously influenced by delusions or hallucinations or serious impairment in communication or judgment, or inability to function in almost all areas, whereas a score of 20 suggests some danger of hurting self or others, occasional failure to maintain minimal personal hygiene or gross impairment in communication. DSM-IV-TR 34. On the other hand, Scores from 71 to 80 denote that "if symptoms are present, they are transient and an expectable reaction to psychosocial stressors . . . no more than slight impairment in social, occupational, or school functioning." Id. Scores from 61-70 denote "some mild symptoms (e.g., depressed mood and mild

stay, she was placed in seclusion and observed in a manic state singing, banging on doors, and yelling. R. 246. For treatment, she was prescribed Zyprexa, to reduce the risk of imperiling her pregnancy, and her symptoms subsided. Id. Although Ms. Nixon's physician would have liked her to remain in inpatient treatment for several more days, she was discharged from the hospital upon her insistence and that of her family on July 5, 2001. Id. Upon discharge she was in stable condition, with no homicidal or suicidal ideation. Id. She was given a GAF score of 40-50. R. 247. She was directed to follow-up on an outpatient basis with Dr. Mansheim. Id.

On January 9, 2007, Ms. Nixon reported to Virginia Beach Psychiatric Center for observation, stabilization, and treatment. R. 190. The Admission Note from that visit indicates that she had been noncompliant with her medication regimen and was in an agitated and manic state. R. 197. She was not sleeping or eating well and was not caring for herself or functioning adequately. R. 190. She was largely nonresponsive to the evaluating physician's questions, but he observed that her speech and psychomotor activity were increased. R. 198. She was oriented as to person, place, and time, but her thought content was paranoid. R. 191. She had no

---

insomnia) or some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well, has some meaningful interpersonal relationships." Id.

-18-

suicidal or homicidal ideations. Id. Her memory, fund of knowledge, and ability to calculate serial sevens was intact. Id. She was diagnosed as "Bipolar, Manic" and given a GAF score of 10-20.[18] Her highest GAF score in the last year was estimated to be 70-80. Id.

During her stay, Ms. Nixon stabilized and did well with treatment. R. 192. She "was cheerful, optimistic and bright, interacting well with patients and staff." Id. Upon discharge on January 15, 2007, Ms. Nixon's treating physician noted that she was ready to begin treatment on an outpatient basis, but that Ms. Nixon was "poorly committed to the notion that she needed to be on long-term medications." Id. Her GAF score was 50, and she was noted as being stable. Id.

The last record of hospitalization is from August 11, 2008 when Ms. Nixon reported to Virginia Beach Psychiatric Center exhibiting manic behavior, having changes in speech, flight of ideas, racing thoughts, and poor sleep and appetite. R. 266. The Admission Note indicates that she had not been taking her medications because "they made her eyes puffy." R. 266. She was observed as having reduced speech and psychomotor activity and as exhibiting restless, wild, hostile, and angry behavior.

---

[18] This range indicates that the patient is in "[s]ome danger of hurting self or others, . . . OR occasionally fails to maintain minimal personal hygiene, . . . OR [exhibits] gross impairment in communications." DSM-IV-TR 34.

Id.  Her memory, fund of knowledge, and ability to calculate serial sevens was intact.  Id.  She was oriented as to person, place, and time.  Id.  She was diagnosed as "Bipolar, manic." R. 267.  No GAF score was recorded.  Id.

A second evaluation on August 14, 2008 revealed that Ms. Nixon had pressured speech, looseness of association, and delusions about children being in her room that were not supposed to be there.  R. 264.  Her judgment and insight were extremely poor.  Id.  The examining physician noted that she required involuntary commitment and administration of medications against her will.  R. 264-65.  He recommended a "medication order" because she was unable to care for herself and was threatening to others.  Id.

During her stay, Ms. Nixon's condition stabilized.  R. 237. She was discharged against medical advice on August 20, 2011 at her request.  R. 238.  At the time, her condition was "somewhat improved, stable, and contracting for safety."  Id.  She was not a danger to herself or others and she agreed to attend the Partial Hospitalization Program.  Id.  Her GAF score had increased to 50.  Id.  Her discharge medications were Abilify, Haldol, and Depakote.  Id.  She expressed willingness to take the medications.  Id.

From the treating-source evidence, the ALJ concluded that "there is no detailed, clinical evidence in the case record to

support work disabling limitations as alleged.   Progress notes support on-going issues of non-compliance with medication; however, when stabilized on medication, she is more positive, focused, cheerful, optimistic, and bright, and interacts well with others."   R. 18.   The ALJ gave considerable attention to the records from Ms. Nixon's 2007 and 2008 hospitalizations and noted her GAF scores upon admission and discharge in 2007.   Id.

### iii. State Agency Determination

In accordance with Social Security Ruling 96-6p, the ALJ considered the opinions of the state Disability Determination Service's ("DDS") medical consultants.   The ALJ gave significant weight to these opinions because they were consistent with the overall evidence in the record, which indicated that Ms. Nixon responded well to medication and did not suffer side-effects.   R. 18.

On January 10, 2008, Dr. David Deaver, a state DDS consultant completed a Psychiatric Review Technique form for Ms. Nixon.   He noted that she suffered from an affective disorder characterized by bipolar syndrome under Listing 12.04.   R. 213. Dr. Deaver assessed Ms. Nixon's limitations in the four paragraph B categories and determined that she had "mild" restrictions in her activities of daily living, "moderate" difficulties in maintaining social functioning, "moderate" difficulties in maintaining concentration, persistence, or pace,

and no repeated episodes of decompensation of extended duration.
R. 220. Dr. Deaver noted that the "evidence does not establish
the presence of the [paragraph] 'C' criteria." R. 221. Dr.
Deaver also completed a Residual Functional Capacity Assessment
for Ms. Nixon. R. 224-27. He assessed her ability to perform a
range of activities in the categories of "Understanding and
Memory," "Sustained Concentration and Persistence," "Social
Interaction," and "Adaptation." R. 224-25. He determined that
she was moderately or mildly limited in all areas. Id. Dr.
Deaver concluded that "[w]hile her limitations are present, they
are not so severe to prevent her from performing simple routine
work activity on a regular, sustained basis." R. 226-27. On
August 11, 2008, Dr. Sreeja Kadakkal, a state DDS consultant,
reviewed the evidence in Ms. Nixon's file through that date and
affirmed Dr. Deaver's conclusions.[19] R. 230.

### D. Step Four: Past Relevant Work

At step four, the ALJ determined that Ms. Nixon was capable
for performing past work as a janitor as the job "is actually
performed." See 20 C.F.R. §§ 404.1560(b)(2), 416.960(b)(2).
Ms. Nixon worked as a janitor from 1995 to 1999 and ran an
in-home daycare center from 2000 to 2006. R. 128. At the time

---

[19] The record indicates that August 11, 2008 is the day that Ms.
Nixon presented for her most recent hospitalization.
Accordingly, neither Dr. Deaver nor Dr. Kadakkal reviewed
documentation from that hospitalization in performing their
assessments of Ms. Nixon's condition.

of her alleged disability onset date, Ms. Nixon was 39 years old. R. 18, 123. She has at least a high school education and can communicate in English. R. 18, 131. At Ms. Nixon's administrative hearing, vocational expert Linda Augins testified that janitorial work is classified as unskilled and requires medium physical exertion. R. 62. A daycare worker is classified as semi-skilled and requires light exertion. Id. Ms. Augins testified that someone of Ms. Nixon's age, education, work experience, and RFC could perform the position of janitor. Id. However, such an individual's need for limited interaction with the public and coworkers would preclude employment as a daycare worker. Id.

### E. Step Five: Other Work

Although the ALJ determined that Ms. Nixon was capable of performing past relevant work at step four, he went on to step five, at which he determined that she was capable of adjusting to other work that exists in significant numbers in the national economy. R. 18-19. The ALJ determined that Ms. Nixon had only nonexertional limitations.[20] Rule 204.00 of the Medical-Vocational Guidelines (the "Grids") generally provides a

---

[20] Nonexertional limitations are "all work-related limitations and restrictions that do not depend on an individual's physical strength, including postural and environmental limitations." Soc. Sec. Ruling 96-8p, 1996 WL 374184, at *6; see 20 C.F.R. §§ 404.1569a(c), 416.969a(c).

-23-

framework for determining whether an individual with only nonexertional limitations is disabled. See Soc. Sec. Ruling 85-15, 1985 WL 56857, at *3; see also 20 C.F.R. Pt. 404 Subpt. P, App. 2. Nevertheless, the ALJ may need to consult a vocational resource such as the Dictionary of Occupational Titles ("DOT") or a vocational expert to determine the extent to which the claimant's nonexertional impairments affect her occupational base. Id.

During the administrative hearing the ALJ asked vocational expert Augins whether an individual with Ms. Nixon's RFC, age, education, and past work experience could perform any position other than janitor. R. 62. Ms. Augins responded that such an individual would be able to perform work as a dish carrier, order picker, and laundry laborer, which are all categorized as unskilled medium work. R. 62-63. The same individual would also be able to perform the position of laundry sorter, which is unskilled light work. R. 63. These jobs all existed in significant numbers in the national and local economy. R. 62-63. Ms. Augins testified that these jobs would not allow an individual to be absent more than twice per month and that they would not allow for unscheduled breaks at the discretion of the employee. R. 63.

The ALJ also asked Ms. Augins whether any positions would be available for an individual with Ms. Nixon's vocational

profile who was unable to work a full eight-hour day, five days a week, for a forty-hour week due to fatigue and psychological limitations. R. 63. Ms. Augins testified that no such positions existed. Id. The ALJ determined that Ms. Augins' testimony was consistent with the Dictionary of Occupational Titles ("DOT"). R. 19; see Soc. Sec. Ruling 00-4p, 2000 WL 1898708, at *2. Based on Ms. Augins's testimony and Ms. Nixon's vocational profile, the ALJ determined that a finding of "not disabled" was appropriate under Rule 204.00 of the Grids. R. 19; see 20 C.F.R. Pt. 404 Subpt. P, App. 2.

## IV.   STANDARD FOR REVIEW OF THE COMMISSIONER'S DETERMINATION

Under 42 U.S.C. § 405(g), the scope of judicial review of the Commissioner's final decision is specific and narrow. Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir. 1986). The Court's review of that decision is limited to determining whether there is substantial evidence in the administrative record to support the Commissioner's decision. 42 U.S.C. § 405(g); Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (per curiam); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Hunter, 993 F.2d at 34 (citing Richardson v. Perales, 402 U.S. 389, 401 (1971)). It consists of more than a mere scintilla of evidence

but may be somewhat less than a preponderance.   Id.   (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)).

The Commissioner has the duty to make findings of fact and resolve conflicts in the evidence.   Hays, 907 F.2d at 1453 (citing King v. Califano, 599 F.2d 497, 599 (4th Cir. 1979)). The Court does not conduct a de novo review of the evidence nor of the Commissioner's findings.   Schweiker, 795 F.2d at 345.   In reviewing for substantial evidence, the Court does not undertake to reweigh conflicting evidence, to make credibility determinations, or to substitute its judgment for that of the Commissioner.   Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (citing Hays, 907 F.2d at 1456).   "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Commissioner (or the Commissioner's designate, the ALJ)." Craig, 76 F.3d at 589 (quoting Walker v. Bowen, 834 F.2d 635, 640 (7th Cir. 1987)).   The denial of benefits will be reversed only if no reasonable mind could accept the record as adequate to support the determination.   Richardson v. Perales, 402 U.S. 389, 401 (1971). Accordingly, the Court will not re-weigh the evidence in the administrative record.   Rather it will determine whether a reasonable mind could conclude that the evidence in the record sufficiently supports the ALJ's decision and whether that decision was reached based upon the correct application of

-26-

relevant law. See Coffman v. Bowen, 829 F.2d at 517; Hayes v. Gardner, 376 F.2d 517, 520 (4th Cir. 1967).  If so, the Commissioner's decision must be upheld, even if the Court disagrees. Schweiker, 795 F.2d at 345.

**V. ANALYSIS**

## A. Whether Ms. Nixon Met or Equaled the Requirements of Listing 12.04

Ms. Nixon argues that the ALJ's determination that her mental impairment does not meet or equal the requirements of Listing 12.04 is not supported by substantial evidence. Specifically, she argues that the ALJ erred by not comparing the medical evidence in the record to the symptomatic criteria in paragraph A of Listing 12.04. Pl.'s Sum. J. Supp. Mem., at 12, 14. Ms. Nixon further argues that the ALJ erred in finding that she did not exhibit marked limitations in her activities of daily living, social functioning, or in maintaining concentration, persistence, or pace, and that she did not experience repeated episodes of decompensation of extended duration. Id., at 14-19. Having reviewed the entire record and examined the relevant law, the Court finds that Ms. Nixon's assignments of error lack merit.

### 1. The ALJ Did Not Err by Failing to Explicitly Compare Ms. Nixon's Symptoms with the Criteria of Paragraph A

Ms. Nixon argues that the ALJ failed to properly identify that she has a severe impairment of bipolar disorder and that

-27-

the medical evidence concerning Ms. Nixon's mental impairment required an explicit comparison of symptomology to Listing 12.04. Id. 13-14.   Contrary to Ms. Nixon's assertion, the ALJ specifically determined that Ms. Nixon's bipolar disorder constituted a severe impairment limiting her ability to perform basic work functions at step two of the disability analysis. R. 14.   Moreover, by determining that Ms. Nixon suffered from bipolar disorder and proceeding to examine whether Ms. Nixon satisfied the criteria in paragraphs B and C of Listing 12.04, it appears that the ALJ assumed that she met the criteria in paragraph A.[21] R. 15.   Accordingly, the ALJ was not required to engage in an explicit comparison between Ms. Nixon's symptoms and those in paragraph A of Listing 12.04.[22] See Russell v.

---

[21]   Paragraph A contains of list of symptoms, signs, and laboratory findings that must be demonstrated to medically substantiate the presence of a particular mental disorder. 20 C.F.R. Pt. 404 Subpt. P, App. 1, Listing 12.00(A).   For affective disorders, the claimant must demonstrate the "[m]edically documented persistence, either continuous or intermittent," of "depressive syndrome," "manic syndrome," or "bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes."   Id., Listing 12.04(A).   Depressive and manic syndromes are further characterized by a list of symptoms. Id.
[22] Absent a showing of prejudice, an ALJ's failure to explicitly state his reasoning does not warrant remand. See Stout v. Commissioner, Soc. Sec. Admin., 454 F.3d 1050, 1055 (9th Cir. 2006); Ricks v. Commissioner of Soc. Sec., No. 2:09cv622, 2010 WL 6621693, at *12 (E.D. Va. Dec. 29, 2010) (citing Boone v. Halter, 23 Fed. App'x 182, 183 n.* (4th Cir. 2002); Camp v. Massanari, 22 Fed. App'x 311, 311 (4th Cir. 2001); Tolliver v. Astrue, No. 3:09CV372-HEH, 2010 WL 3463989, at *4 (E.D. Va.

Chater, 60 F.3d 824, at *3 (4th Cir. 1995) (unpublished table decision) (explaining that "an exhaustive point-by-point discussion" of the listed criteria is not required in cases where failure to make such comparisons does not impede judicial review).

### 2. The ALJ Did Not Err in Concluding that Ms. Nixon Did Not Meet the Criteria of Paragraph B

The ALJ concluded that the Ms. Nixon's bipolar disorder did not meet Listing 12.04's paragraph B criteria because she was capable of "managing within a basic routine," able to "interact and relate appropriately with others with medication compliance," and able to "understand and execute simple instructions, to make simple decisions, and set simple goals." R. 15. Ms. Nixon argues that the ALJ summarily reached this conclusion and that, based on her testimony and evidence from her hospitalizations, it is not supported by substantial evidence. Pl.'s Sum. J. Supp. Mem., at 14-19.

Paragraph B of Listing 12.04 contains impairment-related functional limitations that must be satisfied in order to establish that a claimant's impairment is of disabling severity. 20 C.F.R. Pt. 404 Subpt. P, App. 1, Listing 12.00(A).[23] Under

Sept. 3, 2010); Kersey v. Astrue, 614 F. Supp. 2d 679, 696 (W.D. Va. 2009)).

[23] Paragraph C, which contains additional functional limitations, may be consulted if the claimant does not meet the criteria in

paragraph B, a claimant's impairment "must result in at least two of the following: "1. Marked restriction of activities of daily living; or 2. Marked difficulties in maintaining social function; or 3. Marked difficulties in maintaining concentration, persistence, or pace; or 4. Repeated episodes of decompensation, each of extended duration." Id., Listing 12.04(A)-(B). "Marked" means "more than moderate but less than extreme." Id., Listing 12.00(C).

The ALJ determined that Ms. Nixon was mildly limited in her ability to perform activities of daily living, moderately limited in her ability to maintain social function, and moderately limited in her ability to maintain concentration, persistence, or pace. R. 14-15. The ALJ further found that she had experienced no episodes of decompensation of extended duration. R. 15. The ALJ made these findings based on a comprehensive review of the medical evidence before him. R. 15-17; see 20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4) ("The [ALJ's] decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in

---

paragraph B. Id. Ms. Nixon does not contest the ALJ's paragraph C analysis.

-30-

each of the functional areas described in [paragraph B of the relevant listing].").   Accordingly, the ALJ did not summarily reach his decision.

Based on its review of the evidence, the Court also finds that substantial evidence supports the ALJ's conclusions and that they were reached based upon the correct application of relevant law.  As an initial matter, the Court notes that the plaintiff bears of the burden of establishing that an impairment meets or equals the criteria of a listing in Appendix 1.  See Sullivan v. Zebley, 493 U.S. 521, 530 (1990); Smith v. Califano, 592 F.2d 1235, 1236 (4th Cir. 1979).  Other than hospitalization records, there is no evidence in the record that corroborates Ms. Nixon's allegations of severe functional limitations. Moreover, Ms. Nixon's statements about her functional limitations are at times contradictory.   Conversely, the opinions of Dr. Deaver, the state DDS consultant, and Dr. Mansheim, Ms. Nixon's treating psychologist, support the ALJ's conclusion that Ms. Nixon was mildly limited in her ability to perform activities of daily living, moderately limited in her ability to maintain social function, and moderately limited in her ability to maintain concentration, persistence, or pace.

State agency medical consultants are highly qualified physicians who are also experts in Social Security disability evaluation.   20 C.F.R. § 404.1527(f)(2)(i).   The question of

-31-

whether a claimant's impairment meets the requirements of a listed impairment is reserved to the Commissioner, see Soc. Sec. Ruling 96-5p, 1996 WL 374183, at *2, but an ALJ must nevertheless consider the opinions of state agency consultants as expert opinion evidence, see 20 C.F.R. §§ 404.1527(f)(2)(i), 416.927(f)(2)(i); Soc. Sec. Ruling 96-6p, 1996 WL 374180, at *3; Soc. Sec. Ruling 96-5p, 1996 WL 374183, at *6.

Based on his review of the medical evidence and Ms. Nixon's benefits application, Dr. Deaver noted that she "provides personal care, she prepares meals, she performs [house hold] chores, she walks and uses public transportation, she shops in stores." Dr. Deaver noted Ms. Nixon's manic symptoms upon hospitalization in 2007, but also noted that she was doing well with her medication as of December 6, 2007. R. 226. Dr. Deaver concluded that Ms. Nixon was only mildly limited in her ability to perform activities of daily living, moderately limited in her ability to maintain social functioning, and moderately limited in her ability to maintain concentration, persistence, and pace. R. 220. He further concluded that she had no repeated episodes of decompensation of extended duration. Id. Dr. Kadakkal, a second state DDS consultant, affirmed Dr. Deaver's assessment. R. 230. Although Dr. Deaver completed his functional limitations assessment before Ms. Nixon's 2008 hospitalization, there is no medical evidence in the record subsequent to that

hospitalization that contradicts his conclusions concerning Ms. Nixon's functional limitations.

Ms. Nixon argues that evidence from the hospitalizations and her own testimony demonstrate that she had "severe restrictions" in her ability to perform activities of daily living, "significant difficulty with social functioning," and "marked problems with concentration, persistence, and keeping pace." Pl.'s Sum. J. Supp. Mem., at 14.

Ms. Nixon was hospitalized twice between her alleged onset date and the ALJ's decision. As the ALJ noted, Ms. Nixon's hospitalization records indicate that failure to comply with her medication regimen generally precipitated her need for acute psychiatric treatment. R. 17, 192, 237, 273. When she presented for treatment at Virginia Beach Psychiatric Center in 2007 and 2008, Ms. Nixon was having problems eating and sleeping. R. 190, 236. When she presented in 2007, she was not bathing or caring for herself. R. 190. Admission notes from these hospitalizations further indicate that she exhibited flight of ideas, anger, hostility, agitation, and poor communication skills, judgment, and insight. R. 198, 264, 266, 276-77. Upon resuming treatment, Ms. Nixon's condition stabilized, (R. 192, 237, 247, 249), and her 2007 discharge summary notes that she was "more positive and more focused . . . . cheerful, optimistic, and bright, interacting well with patients and

-33-

staff," (R. 192). Dr. Mansheim's progress notes from 2006 through 2009 indicate that when Ms. Nixon complied with her medication regimen she responded well and did not report side-effects. R. 200-04, 280-88. At hearing, Ms. Nixon testified that she understood that she needed to take her medication to prevent manic episodes. R. 57. It is well recognized that if treatment or medication can reasonably control a symptom, that symptom cannot serve as the basis for disability. See Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986); 20 C.F.R. §§ 404.1530, 416.930.

Although Ms. Nixon testified that she requires reminders to fix her hair, dress, and maintain personal hygiene, (R. 47), she stated in her benefits application that she needs no assistance with personal care. R. 134. Ms. Nixon also considers herself a dependable housekeeper and is able to do laundry, prepare one to two meals a day, and do other chores. R. 49-58. She further argues that interpersonal conflicts with supervisors and coworkers at her previous places of employment demonstrate that she is unable to interact appropriately with the public. Pl.'s Sum. J. Supp. Mem., at 17; R. 55, 248. She also cites evidence that she does not attend social events or go out except for doctors' appointments. Pl.'s Sum. J. Supp. Mem., at 16-17; R. 137. Dr. Deaver considered these statements in determining that Ms. Nixon had moderate limitations in her ability to maintain

-34-

social functioning.   He noted, however, that she uses public transportation and goes grocery shopping.   R. 136, 226.   Ms. Nixon argues that her testimony also demonstrates that "she experiences frequent deficiencies with respect to concentration, persistence, and pace."   Pl.'s Sum. J. Supp. Mem., at 18. Yet, her benefits application states that she does "OK" following written instructions and that it might take her a little time to follow spoken instructions.   R. 138.

Ms. Nixon also takes issue with the ALJ's conclusion that she experienced no episodes of decompensation of extended duration.   Her contention is misplaced.   To meet the paragraph B criterion, a claimant must experience "three episodes [of decompensation] within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks."[24] 20 C.F.R. Pt. 404 Subpt. P, App. 1, Listing 12.00(C)(4).   During the period under consideration,   the   record   contains   evidence   of   two hospitalizations,   which   arguably   constitute   episodes   of decompensation.   Ms. Nixon presented no other evidence of episodes of decompensation. These two hospitalizations occurred more than one year apart, and neither lasted the required two weeks.   Accordingly, the ALJ accurately concluded that Ms. Nixon

---

[24] Where a claimant experiences more frequent episodes of shorter duration or fewer episodes of longer duration, the Commissioner must exercise her judgment to determine whether the episodes equal the listing criterion. Id.

-35-

did not meet the fourth criterion of paragraph B, and this conclusion is supported by substantial evidence.

The medical evidence before the ALJ demonstrated that, when medicated, Ms. Nixon's functional abilities improved. Furthermore, she recognized the need to take medication to prevent functional loss. Dr. Mansheim's progress notes indicate that Ms. Nixon generally complied with her medication regimen during the timeframe under consideration. Although Ms. Nixon alleges disabling symptoms, her testimony is inconsistent with her benefits application and Dr. Deaver's opinion evidence. See Craig, 76 F.3d at 595 (an ALJ does not need to accept as true a claimant's statements concerning her symptomatic limitations to the extent that such statements are inconsistent with evidence in the record). Moreover, the ALJ's determination that Ms. Nixon does not meet the functional limitation criteria in paragraph B of listing 12.04 is consistent with Dr. Deaver's findings and other evidence in the record. Accordingly, the Court finds that the ALJ correctly applied the relevant law at step three of the sequential analysis and that substantial evidence supports his findings.

**B.** **Whether Ms. Nixon Retained the RFC to Perform Work on a Regular and Sustained Basis**

"RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a

regular and continuing basis . . . ." Soc. Sec. Ruling 96-8p, 1996 WL 374184, at *1; see 20 C.F.R. §§ 404.1545, 416.945. The ALJ concluded that Ms. Nixon had the RFC to perform simple, repetitive work requiring only occasional decision making, occasional changes in the workplace, and limited interaction with the public and co-workers. R. 15. Implicit in this RFC assessment, was the conclusion that Ms. Nixon was capable of working eight hours a day, five days a week for a total of forty hours a week. See Nall v. Barnhart, 78 Fed. App'x 996, 996 (5th Cir. 2003) (claimant's ability to maintain 40-hour work week was subsumed in ALJ's analysis of RFC); see also Smyrnios v. Astrue, No. 1:08-cv-121, 2009 WL 301952, at *17 (N.D. Fla. 2009) (ALJ's ruling that claimant could work no more than 4-6 hours of work per day precluded finding that claimant was able to work full-time).

Ms. Nixon argues that the ALJ's conclusion is erroneous because the evidence demonstrates that she is not able to perform work on a regular and sustained basis. She specifically argues that the ALJ improperly characterized evidence that she improved while on treatment, that her work history and hospitalizations demonstrate that she is incapable of working eight hours a day, five days a week, and that the ALJ failed to properly account for and explain the weight given to evidence of Ms. Nixon's GAF scores. Pl.'s Sum. J. Supp. Mem., at 20, 21-22,

24; Pl.'s Reply Br., at 3-4.  These arguments essentially amount to an attack on the weight the ALJ gave to certain evidence in the record.  As noted above, the Court's role is limited to determining whether substantial evidence supports the ALJ's findings and whether they were reached based on the correct application of the law.  Craig, 76 F.3d at 589 (citing Hays, 907 F at 1456).

### 1. The ALJ Properly Considered the Effect of Medication on Ms. Nixon's RFC

The ALJ found that, "when stabilized on medication, [Ms. Nixon] is more positive, focused, cheerful, optimistic and bright and interacts well with others." R. 18.  Ms. Nixon argues that the ALJ improperly relied on "isolated instances where Ms. Nixon's treating physician reported that Ms. Nixon was feeling better or showed signs of improvement" in assessing her RFC. Pl.'s Sum. J. Supp. Mem., at 20.  She further contends that the record shows that sometimes her medication worked and sometimes it did not.  Id. at 20.  The record does not support these allegations.

Prior to step five, the burden of proving disability rests on the claimant.  Bowen v. Yuckert, 482 U.S. 137, 148 n.5 (1987); 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3).  The ALJ reaches an RFC determination based on evaluation of all relevant medical and other evidence in the record, including evidence of

-38-

the ameliorative effects of medication.    Id.; see Gross, 785 F.2d at 1163 ("If a symptom can be reasonably controlled by medication or treatment, it is not disabling.").    The ALJ must also consider the negative side effects of treatment or medications on a claimant's RFC.  Soc. Sec. Ruling 83-15, 1983 WL 31245, at *1.  Accordingly, the ALJ appropriately considered the effects of Ms. Nixon's medication in determining her RFC.

Contrary to Ms. Nixon's assertion, the ALJ did not selectively rely on isolated incidents of symptomatic improvement in reaching his RFC determination.    Rather, the ALJ considered a range of evidence relating to the effects of medication upon Ms. Nixon's functional capacity. Upon discharge from inpatient treatment in 2007, Ms. Nixon's treating physician Dr. Mark T. Schreiber noted that she was "cheerful, optimistic, and bright, interacting well with patients and staff" and that she was "positive, focused, motivated and sincere."    R. 192. The record indicates that Dr. Shreiber also treated Ms. Nixon during her 2001 admission to the Virginia Beach Psychiatric Center.  R.  275.  Generally, an ALJ is entitled to give greater weight to the opinions of treating physicians.    See Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir.1987).

Although progress notes from Dr. Mansheim do not speak to Ms. Nixon's functional capacity during the timeframe under consideration, his notes from 2005 through 2009 indicate that

-39-

she did "well" and reported no side-effects when she took her medications. 200-09, 279-88. Moreover, Dr. Deaver observed in the Mental RFC Assessment that he completed for Ms. Nixon that she was responding well to her medication and concluded that her limitations were "not so severe as to prevent her from performing simple and routine work activity on a regular and sustained basis." R. 226. Ms. Nixon also testified concerning the ameliorative effect of her medications. She stated that they helped her speak directly to the ALJ and helped control her manic symptoms. R. 47, 57.

The ALJ also considered evidence of the functional limitations that Ms. Nixon's treatment caused. During the administrative hearing, the ALJ questioned Ms. Nixon about the side effects of her medications. R. 46. She responded that they caused her to urinate frequently, caused stiffness, achiness, and flu-like symptoms and also caused severe drowsiness. R. 47, 54. Ms. Nixon also mentioned these side-effects in her benefits application. R. 186. However, an ALJ does not have to accept as true the statements of a claimant that are inconsistent with other credible evidence in the record. See Craig, 76 F.3d at 595 (explaining two-step process for evaluating a claimant's complaints of pain and other symptoms); 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4).

Dr. Mansheim saw Ms. Nixon at relatively regular intervals between 2005 and 2009, but his treatment notes contain no indication that Ms. Nixon experienced any side-effects from her medications. See Davis v. Astrue, 3:10CV602, 2011 WL 4565576, at *6 (E.D. Va. Sept. 8, 2011) (holding that ALJ did not err in failing to conclude that drowsiness caused by claimant's medication limited claimant's functional capacity where the claimant's testimony was the only supporting evidence). No medical evidence suggests that Ms. Nixon's medications interfered with her functional capacity. See Johnson v. Barnhart, 434 F.3d 650, 658 (4th Cir. 2005) ("'Drowsiness often accompanies the taking of medication, and it should not be viewed as disabling unless the record references serious functional limitations.'") (quoting Burns v. Barnhart, 312 F.3d 113, 131 (3d Cir. 2002); Miller v. Heckler, 770 F.2d 845, 849 (9th Cir. 1985) (holding that the claimant had the burden of producing clinical evidence showing that his use of prescription narcotics impaired his ability to work). Moreover, contrary to Ms. Nixon's contention, there is no evidence that her treatment regimen was ineffective when she followed it. Dr. Mansheim's notes indicate that Ms. Nixon preferred certain medications over others, but they consistently document her medications' efficacy.

-41-

Accordingly, the Court finds that the ALJ did not err in crediting Ms. Nixon's statements concerning the severity, persistence, and limiting effects of her medication only to the extent that they comported with his overall RFC assessment.[25] See Lucas v. Astrue, No. 1:09cv365, 2010 WL 2977266, at *10 (E.D. Va. May 17, 2010), 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4). Moreover, based on the Court's review of the record, substantial evidence supports the ALJ's reliance on the ameliorative effect of medication in determining Ms. Nixon's RFC. R. 15.

## 2. The ALJ Appropriately Considered Evidence of Ms. Nixon's Hospitalizations and Work History

Ms. Nixon cites her hospitalizations, problems with co-workers and supervisors during her employment as a janitor, and inability to comply with state law regulating her in-home daycare center as evidence that she is unable to work on a regular and sustained basis. The ALJ considered these factors in arriving at his RFC determination, but ultimately concluded that they did not preclude her from engaging in substantial gainful activity based, in part, on the significant weight that he gave to Dr. Deaver's assessment of Ms. Nixon's RFC.

Ms. Nixon repeatedly refers to evidence of her various hospitalizations and her mental limitations upon admission as

---

[25] The Court notes that Ms. Nixon does not directly challenge the ALJ's credibility determination.

evidence that she does not retain the functional capacity to work. In relying on this evidence, she ignores the fact that, as a general rule, a claimant must follow the treatment prescribed by her physician, and that the Commissioner is entitled to find her nondisabled if she fails to follow the prescribed treatment without good reason. 20 C.F.R. § 404.1530; see Stewart v. Apfel, 182 F.3d 909, 1999 WL 485862, at *4 (4th Cir. July 12, 1999) (unpublished table decision).

The record contains evidence of four hospitalizations. Two of them predated Ms. Nixon's alleged disability onset date by more than five years. See Carmickle v. Commissioner, Soc. Sec. Admin., 533 F.3d 1155, 1165 (9th Cir. 2008) ("Medical opinions that predate the alleged onset of disability are of limited relevance."). The 2007 and 2008 hospitalizations occurred thirteen months apart and were precipitated by Ms. Nixon's medication noncompliance. R. 197, 236. Moreover, Ms. Nixon has not argued that she is unable to follow her prescribed treatment plan. On the contrary, she has acknowledged the importance of doing so. R. 47, 57. Accordingly, to the extent that evidence from Ms. Nixon's hospitalizations documents Ms. Nixon's functional limitations in an unmedicated state, such evidence was of little relevance to the ALJ's RFC determination.

The ALJ nevertheless thoroughly documented Ms. Nixon's condition during her 2007 and 2008 hospitalizations, (R. 17) and

-43-

noted that her condition improved upon inpatient treatment and outpatient follow-up care. Id. The hearing transcript indicates that Ms. Nixon appreciated her need to comply with her medication regimen, (R. 47, 57), and progress notes from her most recent hospitalization through July 2009 indicate that she was compliant with and responding well to treatment. R. 279-287.

The ALJ's RFC determination also reflects that he considered Ms. Nixon's social functioning and concentration-related limitations. In reaching the RFC determination, the ALJ considered all the evidence in the record. R. 15. The record indicates that the week prior to her 1998 hospitalization, Ms. Nixon was suspended twice from her job as a janitor for failure to comply with company policy. R. 276. She also testified that she stopped working as an in-home daycare provider because she could not comply with state regulations and that she was not hired as a bus driver because she disagreed with the company's seatbelt policy. R. 51-53. Yet she stated that she is very professional when she speaks with employers. R. 55. The ALJ's decision notes that Ms. Nixon has problems getting along with others. R. 16. It also notes that Ms. Nixon was interacting well with staff and other patients after inpatient treatment in 2007. R. 17.

-44-

The ALJ gave significant weight to the expert medical opinion of Dr. Deaver.[26]  R. 18.  As previously discussed, the opinions of state DDS consultants are expert medical opinions. 20 C.F.R. § 404.1527(f)(2)(i).  As such, they may be afforded significant weight when supported by and consistent with other evidence in the record.  See Jones v. Astrue, No. 3:10CV371, 2011 WL 2491346, at *4 (E.D. Va. May 31, 2011); 20 C.F.R. §§ 404.1527(d)(2),(f), 416.927(d)(2),(f); Soc. Sec. Ruling 96-6p, 1996 WL 374180, at *2.  Dr. Deaver considered Ms. Nixon's statements about her functional abilities in her benefits application and her medical records through January 2008 in arriving at his conclusion.  R. 226-27.  He determined that Ms. Nixon was moderately limited in her ability to accept instructions and appropriately respond to criticism from supervisors, carry out detailed instructions, and sustain an ordinary routine without special supervision. R. 225.  He concluded that even with these limitations, Ms. Nixon could perform work on a regular and routine basis.  Dr. Deaver cited substantial evidence in the record to support his conclusions, and they appear to be consistent with other persuasive evidence

---

[26] Ms. Nixon does not challenge the weight accorded to Dr. Deaver's opinion.

in the record.[27]    The fact that records from Ms. Nixon's
hospitalizations suggest lower functional abilities than those
that Dr. Deaver assessed does not undermine Dr. Deaver's
opinion, because Ms. Nixon had stopped and recently resumed
treatment when those observations were made.

Other than Ms. Nixon's own testimony, there is no evidence
in the record contradicting Dr. Deaver's findings concerning her
social and concentration-related limitations.    Accordingly, the
Court finds that the ALJ appropriately considered evidence of
Ms. Nixon's work history and social limitations in determining
her RFC and that substantial evidence supports the ALJ's
decision to give Dr. Deaver's interpretation of this evidence
significant weight.

---

[27]  Dr. Deaver noted that Ms. Nixon's benefits application
indicated that she could perform many normal daily activities,
and that she was limited in her ability to follow written and
spoken instructions.  R.  226,  R.  138.  Dr.  Deaver  also
acknowledged that she does not socialize like she used to.  R.
226, 137.  However, he observed that her most severe symptoms
were observed when she had been off her medication for several
months and that treatment notes from Dr. Mansheim indicated that
she was responding well to her medications. R. 226, 200-02.  The
medical records from Ms. Nixon's 2008 hospitalization confirm,
rather than undermine, Dr. Deaver's assessment.  Those records
indicate that Ms. Nixon had stopped taking her medication when
she presented with symptoms requiring hospitalization, but her
condition improved, and she was doing "reasonably well" with
treatment during and subsequent to her hospitalization.  R.
236-37, 285-279.

3.    **The ALJ did not Err by Failing to Give Specific Weight to Ms. Nixon's GAF scores**

Ms. Nixon asks the Court to remand the case and direct the Commissioner to specifically address Ms. Nixon's GAF scores. Pl.'s Reply Br., at 4. She argues that this is warranted because the ALJ failed to explain "how or why he discounted the significance of plaintiff's GAF scores" and his decision is therefore not supported by substantial evidence. Id. at 3.   In support of her argument, Ms. Nixon cites unreported cases from the Eastern District of Pennsylvania.   See Cruz v. Astrue, No. 06-4644, 2010 WL 3809829, at *10 (E.D. Pa. Sept. 28, 2010) ("'An ALJ who has failed to specifically address a claimant's GAF score or who has discounted the score without providing reasons has thus committed reversible error and his decision must be remanded for further consideration.'")(quoting Robleto v. Barnhart, No. 05-4853, 2006 WL 2818431, at *8 (E.D. Pa. Sept. 18, 2006)); Span v. Barnhart, No. 02-7399, 2004 WL 1535768, at *6-8; (E.D. Pa. May 21, 2004) (remanding case because ALJ did not disclose a basis for discrediting the plaintiff's GAF scores); Escardille v. Barnhart, No. 02-2930, 2003 WL 21499999, at *7 (E.D. Pa. June 23, 2003) (same).

"The GAF score 'reflects a clinician's subjective judgment of a patient's overall level of functioning'" at the time of evaluation.   Allen, 2010 WL 1142031, at *10 (quoting Stoddard v.

-47-

Astrue, 2009 WL 2030349, at *10 n.3 (C.D. Cal. July 8, 2009));
see Brown v. Astrue, No. 7:08cv003, 2008 WL 5455719, at *5 n.6
(W.D. Va. Dec. 31, 2008) ("A GAF score is a snapshot of a
person's functioning at a particular point in time, and is not a
longitudinal indicator of the person's functioning."). The Court
has previously acknowledged that courts appear to be split over
whether an ALJ must "specifically consider a GAF score provided
by a treating physician when assessing the claimant's RFC, and
explain the reasons for crediting or discrediting the score."
Allen, 2010 WL 1142031, at *10 (discussing cases).

The SSA has noted that the GAF scale does not correlate
directly with the criteria for evaluating disability based on
mental impairments. See Revised Medical Criteria for Evaluating
Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg.
50,746-01, 50764-65 (Aug. 21, 2000). Courts in this circuit
have generally adhered to this position. See, e.g., Harvey v.
Astrue, No. 1:10CV00074, 2011 WL 4381150, at *5-*6 (W.D. Va.
Sept. 21, 2011); Davis v. Astrue, No. JKS 09-2545, 2010 WL
5237850, at *3 (D. Md. Dec. 16, 2010); Lucas v. Astrue, No.
1:09cv365, 2010 WL 2977266, at *10 (E.D. Va. May 17, 2010);
Criswell v. Astrue, No. 2:08cv00023, 2009 WL 1351515, at *6,
(W.D. Va. May 14, 2009). Moreover, the ALJ is not required to
evaluate in writing every piece of medical evidence in the
record. Carlson v. Shalala, 999 F.2d 180, 181 (7th Cir. 1993)

(per curiam); see Wyatt v. Bowen, No. 89-2943, 1989 WL 117940, at *4 (4th Cir. Sept. 11, 1989)("[T]he duty of explanation will be satisfied when the ALJ presents 'us with findings and determinations sufficiently articulated to permit meaningful judicial review.'")(unpublished opinion) (citations omitted).

Although the ALJ did not specifically refer to Ms. Nixon's 1998, 2001, 2005, or 2008 GAF scores, the ALJ explained that his RFC determination was based "on careful consideration of the entire record." R. 15. Ms. Nixon was only assigned four GAF scores between her alleged disability onset date and the ALJ's decision. All four were assigned during inpatient observation and treatment at Virginia Beach Psychiatric Center. The ALJ noted that Ms. Nixon was given a GAF score of 10 to 20 when she presented for hospitalization in January 2007. The ALJ also noted that her GAF score upon discharge was 50, indicating that she had improved but that she still exhibited "serious impairment in social, occupational, or school functioning." DSM-IV-TR 34. However, notes from this hospitalization, reveal that Ms. Nixon was also thought to have reached a score of 70-80 within the last year. R. 191. Ms. Nixon was not assigned a GAF score upon her admission to Virginia Beach Psychiatric Center in August 2008, but her score upon discharge was assessed as 50. R. 237, 267. Upon discharge from her two prior hospitalizations, Ms. Nixon was given GAF scores between 40 and 50. Her treating

-49-

physician during her 2001 hospitalization believed she had obtained a score of 70-80 during the past year. The only GAF score not associated with a hospitalization was provided by Dr. Mansheim in 2005. He gave her a score of 60.

The Sixth Circuit has acknowledged that although "a GAF score may be of considerable help to the ALJ in formulating the RFC, it is not essential to the RFC's accuracy." Howard v. Commissioner of Soc. Sec., 276 F.3d 235, 241 (6th Cir. 2002). Further weakening Ms. Nixon's claim that the ALJ erroneously failed to explain the weight given to her GAF scores is the fact that she apparently resumed work as a janitor after being assessed a GAF score of 45, (R. 128, 248), and worked with children on a daily basis for almost five years after being given a GAF score of 40-50. R. 247. See Murphy v. Bowen, 810 F.2d 433, 438 (4th Cir.1987) ("[E]vidence showing that a claimant has worked despite a long standing impairment may be substantial evidence that the impairment is not disabling."); see also Allen, 2010 WL 1142031, at *10.

The ALJ acknowledged Ms. Nixon's affect and symptoms upon her hospitalizations, but ultimately concluded that "there is no detailed, clinical evidence in the case record to support work disabling limitations as alleged." R. 18. If anything, Ms. Nixon's GAF scores clearly show that her mental health and functioning improved with treatment. Moreover evidence from Dr.

Mansheim and Dr. Deaver support the ALJ's conclusion that Ms. Nixon is capable of performing simple, repetitive work requiring only occasional decision making, occasional changes in the workplace, and limited interaction with the public and co-workers. Accordingly, as at least one other court in this circuit has held, the ALJ's failure to specifically discuss Ms. Nixon's GAF scores does not mean that his RFC determination was not supported by substantial evidence. See Light v. Astrue, No. 5:10-cv-70, 2011 WL 1897813, at *4-*5 (W.D. Va. May 17, 2011).

In light of the foregoing analysis and review of the record before the ALJ, the Court finds the ALJ did not commit the errors of which Ms. Nixon complains. Moreover, substantial evidence supports the ALJ's conclusion that Ms. Nixon was capable of performing simple, repetitive work, requiring only occasional decision-making and changes in the workplace and only limited interaction with the public and coworkers on a regular and continuing basis.

## C. Whether Ms. Nixon Was Capable of Performing Past Relevant Work

Ms. Nixon argues that substantial evidence does not support the ALJ's conclusion that she was capable of performing past relevant work as a janitor. Ms. Nixon's arguments in support of this position are the same as those levied against the ALJ's RFC determination. The foregoing analysis explains the substantial

-51-

evidence supports the ALJ's RFC determination. Ms. Nixon's argument nevertheless warrants examination of the law governing step four of the disability analysis to determine whether the ALJ correctly applied it. The Court finds that he did.

At step four, the Commissioner must consider whether the claimant's RFC allows her to perform past relevant work. 20 C.F.R. §§ 404.1560(b), 416.960(b). The Commissioner may consider whether the claimant is able to perform past relevant work as the claimant performed it or as the work is generally performed in the national economy. Id. § 404.1560(b)(2). In reaching a decision, the Commissioner may ask the claimant about the requirements of past work and may need to consult vocational resources such as the DOT or take testimony of a vocational expert. Id. The claimant nevertheless bears the burden of demonstrating that her mental impairments prevented her from performing past relevant work. Bowen, 482 U.S. at 148 n.5 (1987); Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1973).

In the instant case, the ALJ determined that Ms. Nixon's work as a janitor and in-home daycare provider constituted past

relevant work.[28] R. 61. During Ms. Nixon's hearing, the ALJ questioned her about her past work experience, including as a janitor. R. 50-55. Ms. Nixon's benefits application also provides information about the nature of her previous jobs. R. 142. Ms. Nixon generally testified that she did not think she could return to work. R. 55. However, she has provided no evidence directly corroborating this assertion, and Dr. Deaver's opinion explicitly contradicts it.

The ALJ consulted vocational expert Linda Fernandez Augins to determine whether Ms. Nixon's assessed RFC allowed her to perform past relevant work. R. 62. Ms. Augins testified that an individual with Ms. Nixon's age, education, work experience, and RFC could perform work as a janitor. R. 62. She also testified that such an individual's social limitations would prevent her from working as a daycare provider. Id. Ms. Augins stated that her testimony comported with the DOT. R. 64. Ms. Nixon does not argue, and there is no evidence, that the ALJ committed legal error in examining Ms. Augins or crediting her testimony. Moreover, she has not met her burden of producing evidence that she is unable to return to work as a janitor.

---

[28] At hearing, the ALJ questioned Ms. Nixon about her work as a bus driver but told the vocational expert to disregard that job because it lasted less than a month. R. 53, 61; see 20 C.F.R. § 404.1560(b) ("past relevant work is work that you have done within the past 15 years, that was substantial gainful activity, and that lasted long enough for you to learn to do it.").

Notably, none of Ms. Nixon's treating or examining physicians ever opined that she was incapable of employment, and she was apparently able to return to work as a janitor after her 1998 hospitalization. Accordingly, the Court finds that substantial evidence supports the ALJ's conclusion that Ms. Nixon was able to perform past relevant work as a janitor and that this conclusion was reached based upon the correct application of the law.

## VI.  CONCLUSION

Based on the foregoing analysis, the Court FINDS that the ALJ's decision was based upon substantial evidence.  In particular, the Court FINDS that substantial evidence supported (1) the ALJ's finding that Ms. Nixon's bipolar disorder did not meet the requirements of Listing 12.04, (2) the ALJ's RFC assessment, and (3) the ALJ's finding that Ms. Nixon was capable of performing past relevant work as a janitor.

## VII. RECOMMENDATION

For the above-stated reasons, the Court recommends that the defendant's motion for summary judgment, (ECF No. 11), be GRANTED, that Ms. Nixon's motion for summary judgment (ECF No. 9), be DENIED, and that the Commissioner's decision be AFFIRMED.

## VIII.  REVIEW PROCEDURE

By copy of this Report, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1):

-54-

1.   Any party may serve upon the other party and file with the Clerk specific written objections to the foregoing findings and recommendations within 14 days from the date of mailing of this Report to the objecting party, computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure, plus three days permitted by Rule 6(d) of said rules.   See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2).

2.   A district judge shall make a de novo determination of those portions of this Report or specified findings or recommendations to which objection is made.   See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3).

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of the right to appeal from a judgment of this Court based on such findings and recommendations.   Thomas v. Arn, 474 U.S. 140 (1985); Carr v. Hutto, 737 F.2d 433 (4th Cir. 1984); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

_____

UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
January 18, 2012

-55-

## <u>Clerk's Mailing Certificate</u>

A copy of the foregoing Report was mailed this date to the following:

        Charlene A Morring, Esq.
        Montagna Klein Camden LLP
        425 Monticello Ave
        Norfolk, VA 23510
            *Counsel for* plaintiff
            *Shirleyann Bethea Nixon*

        Lawrence Richard Leonard, Esq.
        Assistant United States Attorney
        United States Attorney's Office
        101 West Main Street, Suite 8000
        Norfolk, VA  23510
            *Counsel for defendant Michael*
            *Astrue, Commissioner of Social*
            *Security*

                        Fernando Galindo,
                        Clerk of Court

By:   _____
                  Deputy Clerk

                  January 18, 2012